## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KEITH DEWANE HOPPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 24-CV-0416-GKF-SH** |
| | ) | |
| **TULSA COUNTY SHERIFF'S** | ) | |
| **OFFICE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Plaintiff Keith Dewane Hopper, a self-represented Oklahoma prisoner,[1] brings this civil rights action under 42 U.S.C. § 1983, claiming Defendants—all of whom are associated with the Tulsa County Sheriff's Office—violated rights guaranteed to him by federal and state law while he was detained at the David L. Moss Criminal Justice Center in Tulsa, Oklahoma ("the Tulsa County Jail"). Dkt. 1. Before the Court are the motions to dismiss filed by Amy Fletcher, Kristi Arnzen, and Christina Rose (Dkt. 22); Stacie Holloway and Marcus Berry (Dkt. 24); the Tulsa County Sheriff's Office and Tulsa County Sheriff Vic Regalado (Dkt. 25); and Jovanna Fiorio and Matthew Stansill (Dkt. 29). Hopper did not respond to these motions and the time to do so has

---

[1] Because Hopper appears without counsel, the Court liberally construes his filings. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The Court, however, does not act as his advocate. *Id.*

passed.  For the reasons discussed below, the Court grants Defendants' motions and dismisses the complaint.[2]

## I.    Background

Hopper, who was detained at the Tulsa County Jail beginning in March 2023, alleges Defendants violated his civil rights between December 2023 and September 2024.  Dkt. 1 at 12-23; Dkt. 22-1 at 13-38.[3]  Because the basis for his detention provides context for his claims, the Court takes judicial notice that, in August 2022, the State of Oklahoma charged Hopper with preventing a witness from giving testimony, domestic assault and battery (second offense), and domestic assault and battery by strangulation.  Dkt. 22-1 at 4-5.[4]  On August 19, 2022, the state

---

[2] On July 25, 2025, the Court determined Hopper may not have timely received Defendants' motions, due to his transfer to a different correctional center, and granted Hopper leave to respond the motions on or before September 2, 2025.  Dkt. 28.  On September 8, 2025, Hopper requested a stay of this proceeding and, in the alternative, an additional 120 days to respond to the motions.  Dkt. 31.  The Court denied both requests but extended the response deadline for an additional fourteen days, or until September 16, 2025.  Dkt. 32.  Despite Hopper's failure to respond to the motions, the Court has carefully "examine[d] the allegations in [his] complaint" to "determine whether [he] has stated a claim upon which relief can be granted."  *See Issa v. Comp USA*, 354 F.3d 1174, 1177-78 (10th Cir. 2003) (discussing court's obligations in considering a motion to dismiss for failure to state a claim when the non-moving party fails to respond).

[3] For consistency, the Court's citations refer to the CM/ECF header pagination.

[4] Defendants ask this Court to take judicial notice of the state court docket in *State v. Hopper*, Tulsa County District Court Case No. CF-2022-3018, and certain orders entered in that case.  *See* Dkt. 22 at 3 n.3; Dkt. 22-1 (docket sheet); Dkt. 22-2 (no-contact order).  As further discussed below, Hopper's claims challenge his treatment while he was detained at the Tulsa County Jail awaiting prosecution on criminal charges in the Tulsa County case and allege facts related to restrictions on his ability to communicate with those outside the jail, including his wife who was the alleged victim of his offenses.  The Court thus agrees with Defendants that it is appropriate to take judicial notice of the publicly available docket sheet in the Tulsa County case and certain orders filed in that case to provide context for Hopper's claims.  *See Gee v. Pacheco*, 627 F.3d 1178, 1186-87 (10th Cir. 2010) (discussing materials courts may consider in evaluating sufficiency of a complaint); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

district court ordered Hopper to have no contact with the victim of his charged offenses, Hopper's wife Deanna Lyn Dale, either directly or through third parties. *See id.* at 6 (docket entry, dated August 19, 2022; Dkt. 22-2 (order prohibiting contact, dated August 19, 2022); Dkt. 1 at 19 (identifying Dale as Hopper's wife). The state district court eventually ordered Hopper released on bond but revoked his bond in March 2023. Dkt. 22-1 at 5-6, 13-14. On January 26, 2024, the state district court again ordered Hopper, who was then detained at the Tulsa County Jail "to have no contact with" Dale and further ordered that Hopper was "not to have access to devices at the jail to contact" Dale. *Id.* at 25. On February 16, 2024, the state district court "restore[d] access to telephone for [Hopper] to communicate outside the jail except for [with Dale]" and again ordered that Hopper was "not to communicate directly or indirectly through third parties with [Dale]." *Id.* at 26.

## II.    Plaintiff's claims and allegations

Hopper brings this action against nine defendants:  (1) the TCSO; (2) Sheriff Regalado, (3) Stacie Holloway, Jail Administrator; (4) Major Marcus Berry; (5) Amy Fletcher, Risk Management; (6) Christina Rose, Risk Management; (7) Matthew Stansill, Disciplinary Hearing Officer; (8) Corporal Jovanna Fiorio; and (9) Kristi Arnzen. Dkt. 1, at 1, 10. He purports to sue each individual defendant in his or her individual and official capacities. *Id.*

Liberally construing the complaint, Hopper appears to assert the following federal claims: (1) claims alleging violations of his First Amendment right to association; (2) claims alleging violations of his First Amendment rights to free speech and to seek redress; (3) claims alleging violations of his Sixth Amendment right to obtain witnesses in his own defense; (4) claims alleging violations of his Fourteenth Amendment right to due process based on the excessive use of force and unreasonable body searches; and (5) claims alleging violations of his Fourteenth Amendment

3

right to due process based on unfair disciplinary proceedings and unconstitutional punishment. *Id.* at 12-23. Hopper also appears to assert state law claims: (1) for the tort of "assault and battery" related to the alleged excessive use of force, *id.* at 12-14; and (2) for violating his statutory rights under "Oklahoma Consumer Protection Laws," *id.* at 17-23.[5] Hopper makes the following allegations to support these claims and roughly organizes his allegations into five sections: (1) excessive use of force and unreasonable searches; (2) grievances and restrictive housing; (3) disciplinary write-up and hearing; (4) interference with familial association; and (5) municipal liability. *Id.*

### A.    Excessive use of force and unreasonable searches

On December 19, 2023, Defendants Holloway and Berry ordered the Special Operations Response Team ("S.O.R.T.") at the Tulsa County Jail to "storm" Pod J-10. Dkt. 1 at 12. The S.O.R.T. Team was armed with tasers and nonlethal weapons, dressed in full riot gear, and wearing facial coverings. *Id.* at 12-13. Hopper was sitting at a table with his back to the main door, preparing legal work. *Id.* at 13. Hopper heard a yell, turned his head, and saw "an unidentified S.O.R.T. Team member wearing facial cover [and] pointing what seemed to be a firearm at Hopper. *Id.* Hopper feared being shot, turned his head, "heard a loud 'pop,'" and "felt a sharp pain in [his] lower back." *Id.* Hopper dropped to the floor with his hands at his sides and heard the S.O.R.T. Team "screaming at everyone." *Id.* Officer Roberts ordered Hopper to place his hands on his head "then placed an unwanted touch upon [Hopper's] body by grabbing [Hopper's]

---

[5] In his complaint, Hopper asserted additional federal claims and attempted to bring criminal charges against Defendants. Dkt. 1, generally. However, on preliminary screening, pursuant to 28 U.S.C. § 1915A, the Court dismissed the complaint, in part, and allowed Hopper to proceed only on the federal and state law claims identified herein. Dkt. 12 at 7-8.

ankle and dragging [him] backwards across the floor." *Id.* Hopper was then forced to his feet and taken to medical where Roberts photographed the injury on Hopper's back and a nurse examined Hopper. *Id.* Thereafter, Hopper was taken to Pod J-1, "placed in a shower and ordered to strip naked." *Id.* He obeyed the order "out of fear." *Id.* Hopper was then ordered to bend over and show his anus, causing him to feel humiliation and that he had been sexually assaulted. *Id.* Hopper was placed, alone, in Cell E of Pod J-1. *Id.* Several minutes later, Hopper was standing inside his cell when S.O.R.T. Team officers ordered him to sit down on a rack with no mat. *Id.* Hopper "was doing nothing wrong so [he] refused." *Id.* S.O.R.T. Team officers then opened the cell door, pushed Hopper onto the rack, pulled him back up, cuffed his hands behind his back, forced him to sit in a chair in the middle of the cell, and locked him in the cell. *Id.*

On July 19, 2024, "S.O.R.T. Team again rushed into Pod J-2 and used force and fear to order [Hopper] to do another strip search without cause nor reason forcing him again under threat to bend forward [and reveal his anus], again humiliating [Hopper] and making [him] feel sexually assaulted." *Id.*

### B. Grievances and restrictive housing

Hopper filed "multiple" grievances regarding the December 2023 S.O.R.T. Team incident, complaining of "excessive force and sexual assault." Dkt. 1 at 14. "All grievances were in fact denied for frivolous reasons." *Id.* Defendants Fletcher, Rose, and Arnzen threatened to "take action against" Hopper if he "continue[d] to exercise his grievance process." *Id.* Hopper's wife and "multiple other inmates" filed complaints with the Oklahoma Department of Health regarding the S.O.R.T. Team incident. *Id.* "Due to the complaints filed around 1/16/24 [Hopper] was informed he would be placed in restrictive housing permanently." *Id.* Hopper remained in restrictive housing for about sixty days "being punished for exercising grievance procedures." *Id.*

Hopper begged Holloway to release him, and Hopper was "finally released from restrictive housing." *Id.*

Around April 28, 2024, Hopper "was again locked in restrictive housing without any reasoning given." *Id.* Hopper "filed multiple requests and grievances to Risk Management demanding a reason [he] was being punished." *Id.* at 14-15. Hopper's requests and grievances were denied, and "Risk Management would say, 'our policy allows them to do so.'" *Id.* at 15. Hopper's requests for due process and a hearing were denied. *Id.* Around July 23, 2024, Hopper saw Berry in the law library with Officer McGowan. *Id.* Berry told Hopper that Berry, Holloway, and "Risk Management" "thought [Hopper] should be held in restrictive housing for having addresses of people [Hopper] intended to call as [his] defense witnesses in [his] criminal case." *Id.* "They felt [his possession of those addresses] endangered the facility." *Id.* According to Hopper, that was "untrue" because "neither of the people [for whom he had addresses] worked at" the Tulsa County Jail. *Id.* Hopper perceived retaliation was the true reason for his housing placement. *Id.* Hopper was held in restrictive housing for over 120 days "being punished without cause being denied all due process, with no hearing, review, or legal authority." *Id.* "The facility is lying saying [Hopper] is a danger to the security of the facility when [he has not] done anything wrong." *Id.* Berry and Holloway ordered Hopper to be placed in "complete isolation" "with no other human contact" and without Hopper's consent. *Id.* Hopper was required to be cuffed behind his back and forced to be "on a rec yard completely alone." *Id.* Hopper's isolation caused him to suffer emotional, mental, and spiritual harm, to suffer delusions, and to lose muscle mass. *Id.* at 16.

### C.     Disciplinary write-up and hearing

On August 16, 2024, Hopper "received a disciplinary write-up" from Defendant Fiorio "for conspiracy" because he "used another inmate's account to make a phone call with the other inmate's consent." Dkt. 1 at 17.  Fiorio's incident report reflects that Hopper used another inmate's phone to contact Dale. Dkt. 22-3 at 1.[6]  The report further reflects that Hopper had been prohibited from contacting Dale because she was the alleged victim of the crimes for which he was charged and detained.  *Id.*  Six days after Fiorio issued the report, Defendant Stansill came to Hopper's cell to give Hopper a disciplinary hearing.  Dkt. 1 at 17.  Hopper objected to the hearing, questioned Stansill's authority to act as a disciplinary hearing officer, and alleged "a conflict of interest" because the accuser, Fiorio, and the disciplinary hearing officer, Stansill, are both employed by the TCSO.  *Id.*  Stansill told Hopper the hearing complied with policy and that if Hopper declined consent to the hearing, Stansill "would simply find [Hopper] guilty and punish [him]."  *Id.*  Hopper agreed to the hearing "under duress and threat."  *Id.*  Stansill denied Hopper's requests to "see all write-ups," "see all evidence," and "read the reports," and continued with the hearing.  *Id.*  Stansill asked Hopper if Hopper used another inmate's account.  *Id.*  Hopper asked if it was a crime to do so, and Stansill responded that it violated "policy."  *Id.*  Hopper maintained the policy was unconstitutional, that the policy did not apply to him, and that he did not consent to the policy.  *Id.*  Stansill "advised [Hopper] he was going to punish [him] by taking [his] phone and video visits away."  *Id.*  Hopper did not consent to that punishment and advised Stansill he could not be punished because he was a pretrial detainee.  *Id.*  Stansill twice told Hopper that the jail's policies permit punishment.  *Id.*  Hopper "objected" to Stansill's "false authority."  *Id.*  Hopper wrote down

---

[6] The Court takes judicial notice of the August 16, 2024, incident report because Hopper refers to it in the complaint and it is central to some of his claims.  *See Gee*, 627 F.3d at 1186.

"everything" that he and Stansill discussed, but Stansill refused Hopper's request to sign Hopper's written document. *Id.* at 18. Stansill was unmoved by Hopper's statement that punishing him by taking away his phone privileges would deny Hopper access to the courts even though Hopper was representing himself in state criminal proceedings. *Id.* Hopper threatened to file a federal lawsuit against Stansill. *Id.*

Two days after the disciplinary hearing, Fiorio told Hopper she wrote him up and Stansill punished him because Berry and Holloway "ordered" them to do so. *Id.* Fiorio told Hopper that Berry and Holloway "ordered [Stansill] to order the restrictions on [Hopper's] phone directly going against a court order." *Id.* Hopper's loss of phone and visitation privileges remained in place despite his filing of "requests and grievances," all of which were denied. *Id.*

The "jail and its employees . . . deprived [Hopper] of due process by forcing him[] into a hearing by mere[] jail staff with no judicial authority or standing, denying to provide evidence against him, refusing him the right to confront his accuser and by depriv[ing] him of communication with his family and thus deprived him of his liberty by enforcing [an] unconstitutional, illegal policy on [Hopper]," a pretrial detainee, without his consent. *Id.*

### D.    Interference with familial association

While Hopper was detained at the Tulsa County Jail, Dale acted as his "power of attorney, endorsed witnesses for his defense," helped Hopper file motions in state and federal cases and file complaints with the Oklahoma Department of Health, and "handle[d] his other personal affairs." *Id.* at 19. Fletcher, Rose, Arnzen, Berry, and Holloway "continually interfered with [Hopper's] right to associate and communicate" with Dale, "harass[ed]" Hopper and Dale, and "directly, wrongfully, terminated [Hopper's] right to contact his family," "by blocking all telephone and

email accounts belonging to" Dale and other family members, including Hopper's mother, daughter-in-law, and brother. *Id.* at 19-20.

Through these same actions, Fletcher, Rose, Arnzen, Berry, and Holloway "interrupted phone and email accounts that ha[d] been paid for." *Id.* at 19. "Blocking all communication between not only his wife but other familial association [was] done against consent of [Hopper] and his rights." *Id.* at 19-20. Fletcher, Rose, Arnzen, Berry, and Holloway abused their positions of trust and committed an "illegal intrusion into the family unit" by blocking phone and email accounts. *Id.* at 20. Neither Hopper nor his family members requested blocking of these accounts. *Id.* Fletcher, Rose, Arnzen, Berry, and Holloway "placed a burden upon the marital relationship and warranted an 'unwanted intrusion' in the familial association." *Id.* Because Hopper suffers from mental health issues and separation anxiety, being "completely isolated from human contact" and his "only support system" caused Hopper "irreversible and irreparable emotional, mental, and spiritual harm." *Id.* at 21, 23. Hopper "has not only [a] legal but [a] God given right to speak with his wife and family without intrusion by the jail." *Id.* at 21. Fletcher, Rose, Arnzen, Berry, and Holloway "broke[] the law by blocking telephone and email accounts of [Hopper's] family and friend after the service have been paid for," causing financial harm" to all involved. *Id.*

### E.   Municipal liability

All Defendants violated Hopper's rights "by enforcing made up policy and rules that are illegal and unconstitutional." *Id.* at 12. Hopper alleges "[t]here is an affirmative causal nexus between the violation of [his] constitutional rights and established policy or customs that are maintained by the County of Tulsa/TCSO." *Id.* at 22. More specifically, Hopper alleges the TCSO: (1) maintains a policy of failing to adequately train and supervise TCSO staff "with respect to the rights secured to pretrial detainees who are innocent until proven guilty as well as rights

secured to American Nationals"; (2) has "an established pattern, practice, and custom of [jail employees] violating protected rights and fail[ing] to recognize the limits placed on themselves by the Constitution of the United States of America"; and (3) maintains a policy of failing "to reprimand or discipline and/or ratifying the conduct of officers who violate protected rights secured by the Constitution." *Id.* According to Hopper, these policies and customs "were closely related to the violation of [his] rights" and Sheriff Regalado "is directly responsible for the actions of his employees and for enforcing illegal policy that violates peoples rights at the [Tulsa County Jail]." *Id.*

Hopper also alleges "the county officers acted with deliberate indifference." *Id.* Hopper "clearly gave notice" to the TCSO that he has constitutional rights by giving them written "Legal Notice and Demand" on "multiple occasions." *Id.* at 23. "Officers" at the Tulsa County Jail "deliberately made the choice to ignore these rights and have brought irreversible emotional and spiritual harm to [Hopper]." *Id.* Hopper alleges the risk of maintaining "illegal" policies and customs was "so obvious" that Tulsa County should have known. *Id.*

## III.  Discussion

Liberally construing the complaint, the Court understands Hopper to assert federal claims:

(1) against Berry, Holloway, the TCSO, and Sheriff Regalado for violating his rights under the Fourteenth Amendment to the United States Constitution by (a) using excessive force against him in December 2023 and (b) subjecting him to unreasonable body-cavity searches in December 2023 and July 2024, Dkt. 1, at 12-14, 22-23;

(2) against Berry, Holloway, Fletcher, Rose, Arnzen, the TCSO, and Sheriff Regalado for violating his rights under the First, Sixth, and Fourteenth Amendments by (a) retaliating against him for filing grievances and placing him in restrictive housing in January 2024, (b) retaliating against him for obtaining witnesses for his defense and placing him in restrictive housing in April 2024, and (c) interfering with his rights to familial association by restricting his phone and email privileges, *id.* at 14-16, 19-23; and

(3) against Berry, Holloway, Fiorio, Stansill, the TCSO, and Sheriff Regalado for violating his rights under the Fourteenth Amendment by (a) issuing a disciplinary write-up and depriving him of a fair disciplinary hearing in August 2024 and (b) unlawfully punishing him by restricting his phone and visitation privileges, *id.* at 17-18, 22-23.

In addition, Hopper appears to assert state law claims:

(1) against Berry, Holloway, the TCSO, and Sheriff Regalado, for the tort of "assault and battery"[7] related to the allegedly excessive use of force in December 2023, *id.* at 12-14, 22-23; and

(2) against all Defendants for violating his statutory rights under "Oklahoma Consumer Protection Laws" by blocking his access to prepaid phone and email accounts while he was detained at the Tulsa County Jail, *id.* at 17-23

This Court has original jurisdiction over Hopper's federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3) and has discretion to exercise supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367.  In exercising supplemental jurisdiction over state law claims, a federal court applies the substantive law of the forum state.  *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999).  But "[i]f federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of [supplemental] jurisdiction by dismissing the case without prejudice."  *Bauchman v. W. High School*, 132 F.3d 542, 549 (10th Cir. 1997) (internal quotation marks and citations omitted).

---

[7] Under Oklahoma law, the tort of assault and the tort of battery each require a showing that the defendant acted either with the intent to make a harmful or offensive contact with the plaintiff or with the intent of putting the plaintiff in apprehension of such a contact.  Oklahoma Uniform Jury Instructions-Civil (OUJI-CIV) 19.1, 19.6; *see also Bryson v. Okla. Cnty. ex rel. Okla. Cnty. Det. Ctr.*, 261 P.3d 627, 631 (Okla. Civ. App. 2011) (discussing jury instructions for torts of assault and battery).  In addition, assault requires a showing that the plaintiff was placed in apprehension of harmful or offensive contact or "was caused to suffer fright and terror," whereas battery requires a showing that the defendant's act resulted in nonconsensual harmful or offensive contact.  *Id.*

11

A.    **Dismissal standards**

Defendants move to dismiss the complaint under Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6).  Dkts. 22, 24, 25, 29.  Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed R. Civ. P. 8(a)(2).  This requirement does not demand "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To withstand a Rule 12(b)(6) motion, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible if the facts alleged "raise a reasonable expectation that discovery will reveal evidence" of the conduct necessary to establish plaintiff's claim.  *Id.* at 556; *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  However, a complaint must contain "more than labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action."  *Bell Atl. Corp.*, 550 U.S. at 555.

When considering the sufficiency of a complaint, a court must accept as true all the well-pleaded factual allegations and construe them in the plaintiff's favor.  *Id.*  But the court may disregard legal conclusions or conclusory statements that are devoid of factual support.  *Id.*; *Iqbal*, 556 U.S. at 678.  Simply stated, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.  However, in determining the plausibility of a prisoner's claims, a court also must consider context.  *See Gee*, 627 F.3d at 1185 ("*Iqbal* establishes the importance of context to a plausibility determination.").

> Nowhere in the law does context have greater relevance to the validity of a claim than prisoner civil-rights claims. Prisons are a unique environment, and the Supreme Court has repeatedly recognized that the role of the Constitution within their walls is quite limited. Government conduct that would be unacceptable, even outrageous, in another setting may be acceptable, even necessary, in a prison. Consequently, a prisoner claim will often not be plausible unless it recites facts that might well be unnecessary in other contexts. For example . . . a prisoner claim may not be plausible unless it alleges facts that explain why the usual justifications for the complained-of acts do not apply.

*Id.*; *see, e.g.*, *id.* ("When every prison places legitimate restrictions on prisoner mail, a First Amendment claim of interference with mail ordinarily is not plausible absent factual allegations showing at least that the alleged interference violated prison rules or that the applicable rule was invalid, either generally or in the specific context of the claim.").

Because Defendants include additional factual allegations in their motions and attach supporting exhibits, the Court also briefly notes the limited materials it may consider in evaluating the sufficiency of a complaint. "Generally, the sufficiency of the complaint must rest on its contents alone." *Gee*, 627 F.3d at 1186; *see Swoboda v. Dubach*, 992 F.2d 286, 290 (10th Cir. 1993) ("In determining whether a plaintiff has stated a claim, the district court may not look to . . . any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes."). But there are "limited" exceptions to this general rule. *Gee*, 627 F.3d at 1186. Courts may consider "documents that the complaint incorporates by reference," "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the document's authenticity," and "matters of which a court may take judicial notice." *Id.* (citations omitted).

## B. Legal principles specific to § 1983 claims

Hopper brings his federal claims under § 1983. To state a plausible claim for relief under § 1983, a plaintiff must allege facts demonstrating that (1) a "person" (2) acting under color of state law, (3) deprived the plaintiff of, or caused another to deprive the plaintiff of, (4) a right

protected by the United States Constitution or other federal law. *Dodds v. Richardson*, 614 F.3d 1185, 1199-1200 (10th Cir. 2010); *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002).

Under § 1983, when a plaintiff sues a defendant in his or her individual capacity, the defendant "may be subject to personal liability and/or supervisory liability." *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). A plaintiff must allege facts showing the defendant's "personal involvement in the alleged constitutional violation" to support personal liability. *Id.* To "impose liability upon a defendant-supervisor," who did not personally participate in the alleged violation, a plaintiff must allege facts "show[ing] that '(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'" *Id.* at 1164 (quoting *Dodds*, 614 F.3d at 1199).

When a plaintiff sues a defendant in his or her official capacity, the suit is "essentially another way of pleading an action against the county or municipality [the official] represent[s]." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). But a county "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Rather, a county may be held liable only under a theory of municipal liability. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). To state a plausible municipal liability claim, a plaintiff must allege facts demonstrating "(1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation." *Sanders v. Glanz*, 138 F. Supp. 3d 1248, 1254 (N.D. Okla. 2015). "A plaintiff can demonstrate a 'municipal policy or custom' through an officially promulgated policy; a custom or persistent practice; a single decision by an official with final decision-making authority; ratification by an official with final

14

decision-making authority of subordinates' decisions; or deliberately indifferent training that results in the violation of plaintiff's federally protected rights." *Gooding v. Ketcher*, 838 F. Supp. 2d 1231, 1238 (N.D. Okla. 2012).

### C. Motions to Dismiss

Fletcher, Arnzen, Rose, Berry, Holloway, Fiorio, and Stansill move to dismiss all claims against them for three reasons. They contend: (1) Hopper does not state any plausible constitutional claims against them, in their individual capacities, because his allegations do not suggest any of them violated his constitutional rights; (2) to the extent Hopper asserts official capacity claims against them, those claims are impermissibly redundant with the official capacity claims he asserts against the TCSO and Sheriff Regalado; and (3) to the extent he asserts any plausible individual capacity claims against them, they are entitled to qualified immunity. Dkts. 22, 24, 29. Berry and Holloway additionally move to dismiss Hopper's state law claims for violation of "Oklahoma Consumer Protection Laws" for failure to state a claim or sufficiently identify "what state consumer protection law any defendant is accused of violating." Dkt. 24 at 12-13.

The TCSO and Sheriff Regalado move to dismiss all claims against them for four reasons. They contend: (1) all official capacity claims Hopper asserts against Sheriff Regalado are impermissibly redundant with the claims he asserts against the TCSO; (2) Hopper does not state any plausible municipal liability claims because his allegations do not suggest any county employees violated his constitutional rights or that a county policy was the driving force behind any alleged constitutional violation; (3) Hopper does not state any plausible individual capacity claims against Sheriff Regalado; and (4) this Court lacks jurisdiction over Hopper's state law

claims because Hopper did not comply with the Oklahoma Governmental Tort Claims Act. Dkt. 25.

The Court's consideration of these arguments proceeds in four steps. First, the Court addresses the argument that several of Hopper's official capacity claims are impermissibly redundant. Second, the Court addresses whether Hopper alleges any plausible individual capacity claims against any defendant and, if so, whether any defendant is entitled to qualified immunity. Third, the Court considers whether Hopper alleges any plausible municipal liability claims. Fourth, and only if any federal claims survive dismissal, the Court addresses arguments for dismissal of his state law claims.

### 1.    Impermissibly redundant official capacity claims

The Court finds that Hopper's official capacity claims against Fletcher, Arnzen, Rose, Berry, Holloway, Fiorio, and Stansill should be dismissed because they are redundant with the official capacity claims he asserts against the TCSO and Sheriff Regalado. As just discussed, Hopper's assertion of official capacity claims against Tulsa County officials or employees is "essentially another way of pleading an action against" Tulsa County. *Porro*, 624 F.3d at 1328; *see Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998) ("An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works."). Here, to the extent Hopper intends to assert each of his federal claims against Tulsa County, under a theory of municipal liability, he has effectively done so by asserting each of those claims against the TCSO and Sheriff Regalado, in his official capacity. The Court therefore dismisses the complaint, in part and with prejudice, as to all official capacity claims asserted against Fletcher, Arnzen, Rose, Berry, Holloway, Fiorio, and Stansill.

The Court further finds that it is unnecessary for Hopper to assert municipal liability claims against both the TCSO and Sheriff Regalado, in his official capacity.  These claims too are redundant, and the TCSO and Sheriff Regalado ask the Court to dismiss the official capacity claims against Sheriff Regalado for that reason.  Dkt. 25 at 8-9.  But the TCSO is not a proper defendant in this § 1983 action because it has no separate legal identity from the county it serves.  *Moore v. Diggins*, 633 F. App'x 672, 677 (10th Cir. 2015).  Thus, Hopper's municipal liability claims are more appropriately asserted against Sheriff Regalado, in his official capacity, because Sheriff Regalado is "the Tulsa County official charged with managing the jail."  *Burke v. Regalado*, 935 F.3d 960, 1001 (10th Cir. 2019); *see also Estate of Crowell ex rel. Boen v. Bd. of Cnty. Comm'rs of Cleveland Cnty.*, 237 P.3d 134, 142 (Okla. 2010) ("Under Oklahoma law, the sheriff is the final policymaker for a county jail."); Okla. Stat. tit. 19, § 4 (providing that a county may be sued by naming as a defendant either the applicable board of county commissioners or "by naming a county officer identified in Section 161 of this title when it is alleged that such officer in his or her official capacity is directly or vicariously liable to plaintiff in an action not arising out of contract" and permitting a court to substitute, in place of the board, "a county officer identified in Section 161 of this title in his or her official capacity . . . upon a showing that such county officer is better suited to represent and defend the county under the particular facts of the case"); Okla. Stat. tit. 19, § 161(1) (identifying county sheriff as a "county officer").  For these reasons, the Court dismisses the complaint, in part and with prejudice, as to all claims asserted against the TCSO. The Court considers below whether Hopper states any viable official capacity claims against Sheriff Regalado.  *See infra,* section III.C.3.

### 2.    Individual capacity claims

As previously discussed, a plaintiff seeking to hold a defendant personally liable for a constitutional violation must allege facts showing either (1) that a defendant personally participated in the alleged violation, or (2) that a defendant-supervisor who did not personally participate in the alleged violation "[a] promulgated, created, implemented or possessed responsibility for the continued operation of a policy that [b] caused the complained of constitutional harm, and [c] acted with the state of mind required to establish the alleged constitutional deprivation.'" *Brown*, 662 F.3d at 1163-64 (alterations added) (quoting *Dodds*, 614 F.3d at 1199).

Preliminarily, while Hopper purports to sue Sheriff Regalado in his individual capacity, his only reference to Sheriff Regaldo is in the municipal liability section of the complaint where Hopper asserts that Sheriff Regalado "is directly responsible for the actions of his employees and for enforcing illegal policy that violates peoples rights at the [Tulsa County Jail]."  Dkt. 1 at 22; *see* Dkt. 25 at 12.  Even generously construing the complaint, the Court does not read it as stating any plausible individual capacity claims against Sheriff Regaldo based on personal participation in any alleged constitutional violations or under a theory of supervisory liability.  The Court thus dismisses the complaint, in part and without prejudice, as to all individual capacity claims asserted against Sheriff Regalado.  Next, the Court considers whether Hopper states plausible individual capacity claims against Fletcher, Arnzen, Rose, Berry, Holloway, Fiorio, and Stansill.

### a.    Excessive use of force and unreasonable searches

Hopper appears to claim that Berry and Holloway are personally liable for the violations of his Fourteenth Amendment right to due process arising from (1) the allegedly excessive use of force in December 2023, (2) the allegedly unreasonable body-cavity search in December 2023,

and (3) the allegedly unreasonable body-cavity search in July 2024.  Dkt. 1 at 12-14.  Berry and Holloway contend Hopper fails to state plausible individual capacity claims against them based on these alleged incidents because no allegations plausibly suggest either (1) that they were personally involved in the alleged incidents or (2) that they could be held liable under a theory of supervisory liability.  Dkt. 24 at 6-8.  The Court agrees.

First, none of Hopper's allegations suggests that Berry or Holloway personally participated in using excessive force against Hopper or personally participated in any body-cavity searches of Hopper.  As to the allegedly excessive use of force and the allegedly unreasonable body-cavity search in December 2023, Hopper's sole allegation implicating Berry and Holloway is that they ordered the S.O.R.T. Team to "storm[]" "multiple housing units," including the unit where Hopper was housed.  Dkt. 1 at 12-13.  Hopper's allegations mainly focus on the collective actions of unidentified S.O.R.T. Team officers who were "screaming," threatening violence, and "pointing weapons at everyone"; the action of an unnamed officer who shot Hopper in the back with a nonlethal weapon; the actions of Officer Roberts who "placed an unwanted touch upon [Hopper's] body by grabbing [his] ankle and dragging [him] backwards across the floor," took Hopper to the medical unit, and photographed the injury to his back; and the actions of an unnamed officer (possibly Officer Roberts) who took Hopper to pod J-1, placed him in a shower, ordered him to "strip naked," and conducted a visual body-cavity search that made Hopper feel "humiliated and sexually assaulted.  *Id.*  Hopper also alleges that he was later standing alone in a jail cell when unidentified S.O.R.T. Team officers ordered him to sit down, he refused, the officers entered the cell, pushed him onto the "rack," pulled him back up, handcuffed him, forced him to sit in a chair in the cell, and locked him in the cell.  *Id.*  Hopper's allegations regarding the allegedly unreasonable body-cavity search in July 2024 are even less indicative as to any personal

participation by Berry and Holloway.  Hopper alleges "on 7/19/2024 at 6:15 p.m. S.O.R.T. Team again rushed into pod J-2 and used force and fear to order [Hopper] to do another strip search without cause nor reason . . . again humiliating [him] and making [him] feel sexually assaulted." *Id.*

Second, none of Hopper's allegations plausibly suggests Berry or Holloway could be personally liable for the allegedly excessive use of force or either allegedly unreasonable body-cavity search under a theory of supervisory liability.  In describing the alleged constitutional violations, Hopper states that Berry and Holloway directed S.O.R.T. Team officers to "storm" multiple units in the jail.  Dkt. 1 at 12.  Hopper's word choice does not make this directive nefarious, even if it was given by a supervising officer.  And none of Hopper's allegations suggests that either Berry or Holloway gave more specific directives to any officers to shoot Hopper with a nonlethal projectile, conduct visual body-cavity searches, or compel compliance when Hopper admittedly refused orders to take a seat on the rack in his cell.  *Id.* at 12-14.  Further, Hopper does not identify any TCSO policy that caused these alleged violations.  *Id.*  In other portions of his complaint, Hopper generally alleges that the TCSO has and enforces "illegal" and "unconstitutional policies, fails to adequately train and supervise employees, and has an established "pattern, practice, and custom" of violating the constitutional rights of detainees, and that Sheriff Regalado "is directly responsible for the actions of his employees and for enforcing illegal policy that violates" detainees' rights.  *Id.* at 12, 18-19, 22-23.  Even assuming Berry and Holloway acted in a supervisory capacity by ordering the S.O.R.T. Team officers to "storm" multiple units of the jail in December 2023, Hopper's broad, general, and conclusory allegations regarding the existence and enforcement of "illegal" and "unconstitutional" policies—untethered from Hopper's specific allegations regarding the allegedly excessive use of force and the allegedly

unreasonable body-cavity searches—do not plausibly show that Berry or Holloway, acted with a sufficiently culpable state of mind in their capacities as supervisors so that they could be held personally liable for any alleged actions of subordinate jail officials or employees. *Brown*, 662 F.3d at 1164.

For these reasons, the Court finds that Hopper does not state any plausible individual capacity claims against Berry or Holloway arising from the allegedly excessive use of force in December 2023 or the allegedly unreasonable body-cavity searches in December 2023 and July 2024.

### b.    Grievances and restrictive housing

Hopper appears to claim Fletcher, Arnzen, Rose, Berry, and Holloway retaliated against him for exercising his First Amendment right to seek redress through the filing of administrative grievances and for exercising his Sixth Amendment right to obtain witnesses in his defense. Dkt. 1 at 14-16. These defendants contend Hopper's allegations do not support plausible retaliation claims. Dkt. 22 at 6-7; Dkt. 24 at 8-12. The Court agrees.

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his" constitutional rights. *Smith v. Maschner*, 899 F.2d 940. But "mere allegations of constitutional retaliation will not suffice; plaintiffs must rather allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights." *Frazier v. Dubois*, 922 F.2d 560, 562 n.1 (10th Cir. 1990). To state a plausible retaliation claim, a plaintiff must allege facts showing: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected

conduct." *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).  But here Hopper also must allege facts plausibly suggesting that the actions he perceives as retaliatory were unrelated to any legitimate penological interest.  *See Gee*, 627 F.3d at 1187-88 ("Because [Supreme Court precedent] allows prohibitions and restrictions that are reasonably related to legitimate penological interests, [the prisoner-plaintiff] must include sufficient facts to indicate the plausibility that the actions of which he complains were not reasonably related to legitimate penological interests.").

Even accepting Hopper's allegations as true, the Court finds them insufficient to plausibly allege that Fletcher, Arnzen, Rose, Berry, or Holloway retaliated against him for exercising his First and Sixth Amendment rights.  As to his First Amendment retaliation claim, Hopper alleges he filed multiple grievances related to the December 2023 S.O.R.T. Team incident, and that "all grievances [were] in fact denied for frivolous reasons." Dkt. 1 at 14.  Nothing about this passive (and conclusory) allegation that his grievances were frivolously denied plausibly suggests personal involvement by Fletcher, Arnzen, Rose, Berry, or Holloway.  *See Brown*, 662 F.3d at 1163 (explaining a plaintiff must allege facts showing the defendant's "personal involvement in the alleged constitutional violation" to support personal liability).  Even assuming any of these individual defendants personally denied Hopper's grievances, frivolously or otherwise, the Constitution does not guarantee access to a grievance process, much less a favorable response to grievances.  *See, e.g.*, *Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011) (acknowledging that "there is no independent constitutional right to state administrative grievance procedures"); *Baltoski v. Pretorius*, 291 F. Supp. 2d 807, 811 (N.D. Ind. 2003) ("The right to petition the government for redress of grievances . . . does not guarantee a favorable response, or indeed any response, from state officials.").

Hopper also alleges Fletcher, Arnzen, and Rose made "threats" to "take action" if he "continu[ed] to exercise [his] grievance process." Dkt. 1 at 14. These allegations do suggest personal involvement by Fletcher, Arnzen, and Rose. But these allegations do not plausibly suggest that Fletcher, Arnzen, or Rose followed through on any alleged "threats" or describe any actions these three defendants took in response to Hopper's use of the grievance process. *Id.* Rather, Hopper alleges he "was informed" (by whom it is unclear) that he would be placed in restrictive housing in January 2024, because his wife and other inmates filed "complaints" with the Oklahoma Department of Health. *Id.* Even if the complaints filed with the Oklahoma Department of Health addressed the same subject matter as one or more grievances Hopper may have filed through the jail's grievance process, Hopper does not plausibly allege a connection between the alleged non-specific "threats" to "take action against" Hopper for using the grievance process and his placement in restrictive housing that he alleges was based on his filing of complaints with the health department. *Id.*; *see Shero*, 510 F.3d at 1203 (describing elements of retaliation claim). Likewise, Hopper's passive allegation that some unknown person informed him he would be placed in restrictive housing "due to" the complaints filed in January 2024 is not sufficient to plausibly suggest Fletcher, Arnzen, Rose, Berry, or Holloway either informed him that he would be placed in restrictive housing or had any role in placing him there as retaliation for filing grievances. Dkt. 1 at 14.

Hopper's Sixth Amendment retaliation claims appear to relate to his placement in restrictive housing in April 2024. *Id.* at 14. But his allegations fail to make clear who was involved in this placement decision. He alleges he was placed in restrictive housing "without any reasoning given." *Id.* He also alleges that "Risk Management" (1) refused his demands for justification for this housing placement; and (2) responded to his grievances about this housing placement by

saying "our policy allows them to do so." *Id.* at 14-15.  Hopper also alleges his "multiple" requests for "a hearing or review" of this housing placement were denied.  *Id.* at 15.  None of these allegations support plausible claims against any defendants.

Nonetheless, Hopper further alleges that Berry informed him, in July 2024 (during an encounter with Berry in the law library) that Berry, Holloway, and "Risk Management" thought the April 2024 housing placement was justified because Hopper's possession of addresses of "defense witnesses" allegedly "endangered the facility." *Id.* at 15.  Hopper describes Fletcher, Arnzen, and Rose as part of "Facility Risk Management." *Id.* at 10, 14.  But whatever that means for the roles Fletcher, Arnzen, and Rose might serve at the Tulsa County Jail, Hopper's vague references to the actions of "Risk Management," in the collective, do not plausibly suggest that Fletcher, Arnzen, or Rose, as individuals, might be liable for the decision to place Hopper in restrictive housing in April 2024, much less that any of these three defendants was substantially motivated to make that placement decision to punish Hopper for exercising his Sixth Amendment right to obtain witnesses for his defense. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1250, 1253 (10th Cir. 2008) (emphasizing that notice pleading requires a plaintiff "to differentiate among individual defendants and specify which defendants are alleged to have taken which particular actions"); *Shero*, 510 F.3d at 1203 (describing one element of retaliation claim as requiring plaintiff to show "that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct").  Moreover, even if it is reasonable to infer from his reference to "Risk Management" that Hopper alleges Fletcher, Arnzen, and Rose each personally participated in the decision to place him in restrictive housing in April 2024, he does not state a plausible constitutional violation.  Critically, Hopper's own allegations suggest that he had addresses for "people" (whom, he does not say) and that Berry, Holloway, and "Risk

24

Management" (presumably, Fletcher, Arnzen, and/or Rose) determined that his possession of those addresses posed a security risk to the facility. Dkt. 1 at 15. Hopper is correct that pretrial detainees ordinarily cannot be punished "prior to a lawful conviction." *Peoples v. CCA Detention Ctrs.*, 422 F.3d 1090, 1106 (10th Cir. 2005). But "[t]he determination of whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some other legitimate government purpose." *Id.* And "restraints that 'are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). Thus, a pretrial detainee may be "placed in segregation not as punishment but for managerial reasons." *Id.* (quoting *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002)); *cf. Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) ("Classification of a plaintiff into segregation does not involve deprivation of a liberty interest independently protected by the Due Process Clause." (cleaned up)). Even assuming Fletcher, Arnzen, Rose, Berry, or Holloway had any role in the decision to place Hopper in restrictive housing in April 2024, due to his possession of addresses that posed a potential security risk to the facility, Hopper's bare allegation that he perceived Sixth Amendment retaliation as the "true" reason for that housing placement is not sufficient to plausibly suggest that Fletcher, Arnzen, Rose, Berry, or Holloway violated Hopper's constitutional rights. *See Frazier*, 922 F.2d at 562 n.1.

Based on the foregoing, the Court finds Hopper's allegations, even accepted as true, do not state any plausible First or Sixth Amendment retaliation claims against Fletcher, Arnzen, Rose, Berry, or Holloway, in their individual capacities.

c.        **Disciplinary write-up and hearing**

Hopper appears to claim Fiorio, Stansill, Berry, and Holloway violated his Fourteenth Amendment right to due process by (a) issuing a disciplinary write-up and depriving him of a fair disciplinary hearing in August 2024, and (b) unlawfully punishing him by restricting his phone and visitation privileges.  Dkt. 1 at 17-18.  These defendants contend Hopper's allegations do not support any plausible Fourteenth Amendment claims.  Dkt. 24 at 9-12; Dkt. 29 at 6-8.  The Court agrees.

Hopper's own allegations show that Fiorio issued a disciplinary write-up on August 16, 2024 after Hopper "used another inmate's account to make a phone call."  Dkt. 1 at 17-18. Relevant to this claim, the August 16, 2024, incident report reflects that Hopper used another inmate's phone to contact Dale, in violation of jail policy.  Dkt. 22-3 at 1.  This report further reflects that Hopper had been prohibited from contacting Dale because she was the alleged victim of the crimes for which he was charged and detained.  *Id.*  Fiorio did not violate the Constitution by sanctioning Hopper for violating jail policy and a court order by using another inmate's phone to contact Dale.  *See Gee*, 627 F.3d at 1185 (discussing the importance of context in considering the plausibility of prisoner's claims); *Peoples*, 422 F.3d at 1106 (noting that even when a plaintiff is a pretrial detainee, "restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment" (cleaned up)).

Hopper's allegations further show that he received a disciplinary hearing with Stansill six days after Fiorio issued the incident report.  Dkt. 1 at 17.  Hopper's remaining allegations describe, at length, why Hopper believes Stansill did not treat him fairly during the disciplinary hearing but do not plausibly allege a due process violation.  For example, Hopper alleges the policy against

using another inmate's phone is unconstitutional and does not apply to him; Stansill had no "judicial power" to provide a disciplinary hearing in his role as the disciplinary hearing officer; Stansill had a conflict of interest because Stansill and Fiorio both are employed by the TCSO; and Stansill conducted the hearing without Hopper's consent. *Id.* at 17-18. Even considering these allegations collectively, they do not plausibly suggest that Stansill deprived Hopper of a constitutionally adequate disciplinary hearing. Although prisoners retain due process rights, these rights "are subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). And because "prison disciplinary proceedings are not part of a criminal prosecution . . . the full panoply of rights due a defendant in such proceedings does not apply." *Id.* Hopper's distaste for the disciplinary hearing process does not make that process unconstitutional. Likewise, neither Fiorio nor Stansill unconstitutionally punished Hopper by restricting his phone and visitation privileges after he admittedly used another inmate's phone to contact Dale in violation of jail policy and a court order. *Peoples*, 422 F.3d at 1106.

Lastly, to the extent Hopper alleges Berry or Holloway could be personally liable for allegedly "ordering" Fiorio to issue the disciplinary write-up and "ordering" Stansill to punish him by restricting his phone or visitation privileges, *see* Dkt. 1, at 18, Hopper fails to state any plausible constitutional claims against Berry or Holloway, under a theory of supervisory liability, because none of the actions they allegedly ordered Fiorio and Stansill to take violated the Constitution. *See Brown*, 662 F.3d at 1163-64 (discussing supervisory liability).

For these reasons, the Court finds that Hopper does not state any plausible Fourteenth Amendment claims against Fiorio, Stansill, Berry, or Holloway, in their individual capacities, arising from the disciplinary write-up, the disciplinary hearing, or the corresponding punishment.

### d.    Interference with familial association

Hopper appears to claim Fletcher, Rose, Arnzen, Berry, and Holloway violated his First Amendment right to freedom of association by blocking his phone and email accounts and interfering with his ability to communicate with Dale and other family members.  Dkt. 1 at 19-22.  These defendants contend Hopper's allegations do not support any plausible First Amendment claims against them.  Dkt. 22 at 8-11; Dkt. 24 at 9-12.  The Court agrees.

"[T]he Constitution protects 'certain kinds of highly personal relationships.'"  *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 618, 619-20 (1984)).  "And outside the prison context, there is some discussion in [Supreme Court] cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents."  *Id.*  In addition, the Tenth Circuit recognizes the due process right of familial association as a subset of the freedom of intimate association.  *Trujillo v. Bd. of Cnty. Comm'rs*, 768 F.2d 1186, 1188-89 (10th Cir. 1985).  But the Tenth Circuit also has placed an important limitation on the right of familial association by imposing a state of mind requirement.  *Id.* at 1190.  Specifically, "an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983."  *Id.*  In its discussion of the right of familial association in the prison context, the *Overton* Court succinctly stated:  "The very object of imprisonment is confinement.  Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner.  An inmate does not retain rights inconsistent with proper incarceration."  539 U.S. at 131.  The *Overton* Court also described as "established" the notion that "freedom of association is among the rights least compatible with incarceration."  *Id.*  And, as previously discussed, "the government may subject [pretrial detainees] to the conditions and restrictions of

28

incarceration so long as those conditions and restrictions do not amount to punishment." *Peoples*, 422 F.3d at 1106.

Hopper alleges Fletcher, Arnzen, Rose, Berry, and Holloway "continually interfered with [his] right to associate and communicate with" Dale. Dkt. 1 at 19. He further alleges these same defendants harassed him and Dale "by blocking all telephone and email accounts belonging to" Dale "without her consent or knowledge." *Id.* at 19-20. Hopper also alleges these same defendants blocked phone or email accounts of other family members. *Id.* He alleges these actions were "an illegal intrusion into the family" and "placed a burden on the marital relationship." *Id.* at 20-21. Notably absent from the complaint though are any facts regarding the dates that Fletcher, Arnzen, Rose, Berry, and Holloway allegedly violated the Constitution by restricting Hopper's access to phone and email accounts or otherwise interfering with his ability to communicate with Dale. *Id.* at 19-22. As previously discussed, context matters in assessing the plausibility of a prisoner's claim and courts may take judicial notice of public court records central to a prisoner's claim. *See supra* n.4.

Context is particularly helpful in evaluating Hopper's claim that Fletcher, Arnzen, Rose, Berry, and Holloway violated the First Amendment by interfering with his right to freely associate with Dale and other family members. As discussed, between March 2023 and September 2024, Hopper was detained at the Tulsa County Jail on allegations that he committed domestic violence offenses against Dale and prevented her from giving testimony. Dkt. 22-1 at 4-5, 13-38. On August 19, 2022, when Hopper was charged in his criminal case, the state district court issued a written no-contact order prohibiting Hopper from having contact with Dale, directly or through third parties. *See id.* at 6; Dkt. 22-2. On January 26, 2024, the state district court again ordered Hopper "to have no contact with" Dale and further ordered that Hopper was "not to have access to

devices at the jail to contact" Dale.  Dkt. 22-1 at 25.  On February 16, 2024, the state district court "restore[d] access to telephone for [Hopper] to communicate outside the jail except for [Dale]" and again ordered that Hopper was "not to communicate directly or indirectly through third parties with [Dale]."  *Id.* at 26.  Despite these court orders, Hopper was issued a disciplinary write-up in August 2024 for using another inmate's phone to communicate with Dale.  Dkt. 22-3.

Given this context and because Supreme Court precedent establishes that "freedom of association is among the rights least compatible with incarceration," *Overton*, 539 U.S. at 131, the Court finds it wholly implausible on the facts alleged in the complaint that Fletcher, Arnzen, Rose, Berry, and Holloway blocked phone or email accounts belonging to Dale or Hopper's other family members with the "intent to interfere with a particular relationship protected by the freedom of intimate association." *Trujillo*, 768 F.2d at 1190.  Rather, it is highly plausible that these defendants restricted Hopper's access to phone and email accounts because Hopper repeatedly violated court orders prohibiting Hopper from communicating with Dale as she is the victim of the offenses for which he was charged in state court and detained at the Tulsa County Jail.  As Fletcher, Arnzen, and Rose aptly state, "[t]here is no constitutional right deprivation, either in the process or imposed outcome, of trying to prevent [Hopper] from further violating a court order."  Dkt. 22 at 11.

Considering the facts alleged in the complaint and other facts which this Court finds it appropriate to take judicial notice of, the Court finds that Hopper does not state any plausible claims against Fletcher, Arnzen, Rose, Berry, or Holloway, in their individual capacities, for violating his First Amendment right to association by restricting his access to phone and email privileges.

#### e.    Conclusion as to individual capacity claims

Based on the foregoing the Court concludes that the complaint shall be dismissed, in part and without prejudice, as to all individual capacity claims asserted against Fletcher, Arnzen, Rose, Berry, Holloway, Fiorio, and Stansill, for failure to state a claim on which relief may be granted. Further, because the complaint states no plausible individual capacity claims against any of these seven defendants, the Court finds it unnecessary to consider their assertions of qualified immunity.

### 3.    Municipal liability

By suing Sheriff Regalado in his official capacity, Hopper seeks to impose liability on Tulsa County for the allegedly unconstitutional actions of Fletcher, Arnzen, Rose, Berry, Holloway, Fiorio, and Stansill.  Dkt. 1 at 22-23; *Porro*, 624 F.3d at 1328.  Sheriff Regalado contends Hopper has not plausibly alleged any constitutional violations to support municipal liability and, even if he has, Hopper has not plausibly alleged any Tulsa County policy or custom was the driving force behind any alleged constitutional violations.  Dkt. 25 at 9-13.  The Court agrees.

"[P]roper analysis requires [a court] to separate two different issues when a § 1983 claim is asserted against a municipality:  (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."  *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)).  If the answer to either inquiry is no, a plaintiff has not alleged a plausible municipal liability claim.  *Id.*  As Sheriff Regalado contends, because Hopper has not shown that Fletcher, Arnzen, Rose, Berry, Holloway, Fiorio, or Stansill, individually or collectively, deprived him of any federally protected rights through their alleged actions, he does not state any plausible municipal liability claims against Tulsa County.  Dkt. 25 at 9; *see Crowson*, 983 F.3d at 1191

(explaining that, generally, a municipality cannot be liable absent a showing that "a specific municipal officer violated an individual's constitutional rights" but recognizing "a limited exception where the alleged violation occurred as a result of multiple officials' actions or inactions").

Further, the Court finds that even if Hopper had plausibly alleged at least one constitutional violation (which he has not), his general, conclusory allegations regarding:  the existence and enforcement of "illegal and unconstitutional" policies; "an affirmative causal nexus between the violation of [his] constitutional rights and established policy or customs that are maintained by the County of Tulsa/TCSO"; the TCSO's alleged maintenance of a policy of failing to adequately train and supervise TCSO staff "with respect to the rights secured to pretrial detainees who are innocent until proven guilty as well as rights secured to American Nationals"; the existence of "an established pattern, practice, and custom of [jail employees] violating protected rights and fail[ing] to recognize the limits placed on themselves by the Constitution of the United States of America"; and the TSCO's maintenance of a policy of failing "to reprimand or discipline and/or ratifying the conduct of officers who violate protected rights secured by the Constitution" do not allege any identifiable policies or customs with a sufficient nexus to the constitutional violations he alleges in the complaint.  *See Sanders*, 138 F. Supp. 3d at 1254; *Gooding*, 838 F. Supp. 2d at 1238.

For these reasons, the Court finds that Hopper does not state any plausible municipal liability claims against Tulsa County by asserting claims against Sheriff Regalado, in his official capacity.[8]

---

[8] Because the Court finds that no federal claims survive the dismissal motions, the Court declines to exercise supplemental jurisdiction over Hopper's state law claims and concludes that those claims shall be dismissed without prejudice.  *Bauchman*, 132 F.3d at 549.

### IV.    Conclusion

Based on the foregoing discussion, the Court concludes that Defendants' motions to dismiss shall be granted and the complaint shall be dismissed, under Federal Rule of Civil Procedure 12(b)(6), for failure to state any claims on which relief may be granted.

**IT IS THEREFORE ORDERED** that:

1.  the motions to dismiss filed by Defendants Amy Fletcher, Kristi Arnzen, and Christina Rose (Dkt. 22), Defendants Stacie Holloway and Marcus Berry (Dkt. 24), Defendants Tulsa County Sheriff's Office and Vic Regalado (Dkt. 25), and Defendants Jovanna Fiorio and Matthew Stansill (Dkt. 29) are **granted**;

2.  the complaint (Dkt. 1) is **dismissed in part and with prejudice**, as to:  (a) all official capacity claims asserted against Defendants Fletcher, Arnzen, Rose, Holloway, Berry, Fiorio, and Stansill; and (b) all claims asserted against Defendant Tulsa County Sheriff's Office;

3.  the complaint (Dkt. 1) is **dismissed in part and without prejudice**, as to:  (a) all official capacity claims asserted against Defendant Sheriff Regalado; (b) all individual capacity claims asserted against Defendants Fletcher, Arnzen, Rose, Holloway, Berry, Fiorio, Stansill, and Sheriff Regalado; and (c) all state law claims asserted against all Defendants;

4.  this is a final order terminating this action, and a separate judgment of dismissal shall be entered herewith.

**DATED** this 30th day of September, 2025.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE